FRED DRUMMOND, APPELLEE, V. CITY OF COLUMBUS, APPELLEE: WILLIAM H. HENGGELER, INTERVENER, CROSS-APPELLANT: NORTHWESTERN PUBLIC SERVICE COMPANY, INTERVENER, APPELLANT.

285 N. W. 109

FILED APRIL 3, 1939. No. 30507.

*Walter, Flory & Schmid*, for Northwestern Public Service Company.

*Lowell L. Walker*, for William H. Henggeler.

*Emil F. Luckey*, for Fred Drummond.

*C. J. Garlow, Charles H. Sheldon* and *Perry, Van Pelt & Marti*, for City of Columbus.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ., and POLK, District Judge.

PAINE, J.

Fred Drummond, a resident taxpayer of the city of Columbus, brought an action to enjoin the city from issuing $250,000 of bonds under the revenue bond act. The trial court held there was no equity in the petition of plaintiff, nor in the cross-petitions of two interveners, and dismissed the action. Intervener Northwestern Public Service Company has appealed, and intervener William H. Henggeler has prosecuted a cross-appeal.

Plaintiff's petition against the city, its mayor, and the members of the city council alleged that Columbus was a city of the first class, and that on July 22, 1936, a petition for a special election was filed with the city clerk, signed by 1,198 electors, and that the city council passed a resolution calling a special election for the submission to the voters this question:

"Shall the city of Columbus, Nebraska, construct, purchase, or otherwise acquire an electric light and power distribution system, and/or transmission lines, and real and personal property needed or useful in connection therewith and pay the costs thereof by pledging and hypothecating the revenue and earnings of such distribution system and/or transmission lines to be owned by such city; and in the exercise of the authority granted by law, issue and sell revenue bonds or debentures in an amount not exceeding Two Hundred Fifty Thousand Dollars (250,000.00), for the purpose herein stated, and enter into such contracts in connection therewith as may be proper and necessary.

☐ YES
☐ NO"

On August 20, 1936, the special election was held, and the canvassing board reported that a total of 1,205 votes were cast for the issuance of such revenue bonds, and that 1,154 votes were cast against the issuance of such bonds, making the majority in favor of their issuance 51 votes.

It is further alleged that the petition to the city council was irregular in form, and signatures were illegally secured, that it was insufficient, indefinite, confusing, ambiguous, and drawn in such a manner as to leave to the determination of the city council whether a distribution system should be constructed, purchased, or otherwise acquired, and gave no authority for calling said election; that no estimate of the cost of the construction of an electric light and power plant distribution system "and/or" transmission lines was filed prior to the holding of the special election, as provided by law, and that said special election was not called or held as provided by law.

Said petition also attacks the constitutionality of said law, and charges that Senate File No. 25 (Laws 1935, ch. 38), also known as section 18-1601, Comp. St. Supp. 1935, is incomplete, unconstitutional, and void.

It is also alleged that the city threatens to issue such revenue bonds, and will unless restrained, and to let contracts for the construction of an electrical distribution system in said city, and incur substantial expense for engineering and preliminary expenses, all to the irreparable damage and injury of the plaintiff and other taxpayers of the city of Columbus, for which reasons the plaintiff prays that the election may be declared null and void; that Senate File No. 25 be declared unconstitutional; that the city be enjoined from issuing or selling said revenue bonds for the purpose mentioned, or entering into any contracts for the purchase, construction, or acquiring of a distribution system.

The city of Columbus in its answer admits in brief that plaintiff is a resident taxpayer and consumer of electricity, and admits that the plaintiff prosecutes the action in behalf of himself and of others similarly situated; admits that Columbus is a city of the first class; admits that a petition was presented to the city on July 22, 1936, signed by 1,198 qualified electors, and that said number is more than 20 per cent. of the votes cast at the last general city election; admits that the council passed a resolution calling for a

special election, which was duly held; alleges that Senate File No. 25, which is set out at length in the answer, is a valid act, in full force and effect, and that all proceedings done in connection with Senate File No. 25 are regular and legal; admits that no estimate of costs of the construction of said distribution system was made by the city prior to the special election; denies that there is no available supply of electrical energy for the use of the city; denies that the plaintiff and other taxpayers will suffer irreparable damage and injury, and prays that plaintiff's cause of action be dismissed.

On June 1, 1937, the Northwestern Public Service Company filed its petition of intervention as allowed by the court. Said petition of intervention is too long to be abstracted herein, but alleges in effect that said corporation was operating its electric generating plant and distribution system pursuant to a franchise duly approved by the voters of the city of Columbus, which became effective February 2, 1917, for a term of 15 years, which franchise provided that if said corporation should extend its transmission lines to other municipalities in the trade territory of Columbus, thereby making such plant a central plant, then such franchise should *ipso facto* extend itself for an additional period of 10 years, and that, in keeping with the spirit of the franchise, the company had extended its transmission lines to other municipalities and rural residents, and thereby said franchise did by its terms extend to February 2, 1942; that its transmission lines reach all parts of the city of Columbus and rural districts and small towns in adjacent territory; that it has constantly lowered its rates and improved its service, and that such considerable investments have been made by such corporation in reliance upon the applicable statutes of the state of Nebraska, and upon the Constitution of the state of Nebraska, and upon the Constitution of the United States, in the assurance that said corporation would at all times be protected against unlawful competition, unlawful acts, contracts, or competition not duly authorized by the laws of the state of Nebraska, which

might destroy or render useless the property and rights of the intervener corporation. Intervener further alleges that it has invested in excess of $1,250,000 in the Columbus division, of which $800,000 is allocated to the city of Columbus alone, and that if the city should construct a competing distribution system it would greatly depreciate, if not destroy, a part or all of said system.

Intervener further alleges that plaintiff's petition was not filed in good faith, but that the suit was collusively instituted, and charges that the special election was illegal and void for the reason that signatures were secured to the petition therefor by fraud and misrepresentation; that the preamble of said petition for special election contained false and misleading statements, one being that an ample supply of electrical energy will be available, whereas there was not then, and is not now, an ample supply of "firm" power from any source; that said preamble indicated that electricity would be sold at approximate cost, and at less than the present wholesale cost; that the preamble stated that the current would be available January 1, 1937, that said petition for the special election represented that a complete distribution system for the city of Columbus and urban patrons, comparable with the present system, could be constructed for the sum of $250,000, which was untrue.

The intervener prays that the election held August 20, 1936, be declared null and void; that the city be enjoined from issuing any revenue bonds, or incurring any expense, or entering into any contract for the purchase, construction, or otherwise acquiring of an electric distribution system for said city.

On June 11, 1937, William H. Henggeler, a resident taxpayer of the city of Columbus, also filed his petition of intervention, in which he charges that the plaintiff, Fred Drummond, was and is favorable to the construction of such a system, and is not contesting the same in good faith, or with the desire to prevail, and that there is collusion between the plaintiff and the city, and the same amounts to a constructive fraud upon the court and upon the city, its

taxpayers, and users of electricity in the city, and that a decision therein would not be final or determinative of the matters at issue.

Said intervener Henggeler alleges that the petition of intervention of the Northwestern Public Service Company fails to allege the foregoing deficiencies and collusive institution of the suit between the plaintiff Drummond and the city, and therefore prays that the petition of the plaintiff and the petition of intervener Northwestern Public Service Company both be denied, and that the action be dismissed.

On July 3, 1937, the city of Columbus filed an answer to the petition of intervention of William H. Henggeler, in which it admits that the intervener is an elector, and a consumer of electricity in Columbus, and that no official estimate of the cost of the construction of the distribution system or transmission lines was made prior to the special election, but alleges that an unofficial estimate was made; admits that the mayor and council appointed special counsel. for the city to take steps to establish the validity of the act under which the city is proceeding, but denies all other allegations of said intervener Henggeler's petition.

On July 22, 1937, the said city filed its answer to the petition of intervener Northwestern Public Service Company, and admits that it operates an electric light and power distribution system in Columbus, and has extended its lines to outside territory, making the city of Columbus a central plant; admits that the council of the city of Columbus granted a ten-year extension of its franchise, but denies that the same is valid, and alleges that its contract with the city of Columbus for furnishing street lighting, etc., expires October 1, 1937; and denies all other allegations therein.

In the trial of the case the plaintiff did not testify, and only eight witnesses testified in the case. Joseph F. Stanzel, city clerk of Columbus, identified a large number of records for introduction as exhibits.

The intervener Henggeler called as his witness attorney Emil F. Luckey, who prepared the petition for the plaintiff.

The intervener Northwestern Public Service Company called C. J. Strike, of Huron, South Dakota, its president and general manager, who testified that it was incorporated in Delaware in 1923, and does business in Nebraska and South Dakota. He testified that the city of Columbus had never made any effort to exercise its option to purchase said plant; that his company now serves Richland, Duncan, Silver Creek, Monroe, Platte Center, and Tarnov, and also some 90 rural customers; that the Columbus division of his company has an investment of $1,250,000, and that of this $845,000 is properly chargeable to service in the city of Columbus. He also testified that the stock of the Northwestern Public Service Company was owned by the Middle West Utilities Company, with headquarters in Chicago. James L. Rich, a former city clerk, and E. K. Albert, its electrical engineer, also testified for the Northwestern Public Service Company.

The city of Columbus called only three witnesses, Dewey DeBoer, chief electrical engineer of the Loup Valley Public Power District, Fred C. Albert, supervising civil engineer of the power district, and Robert Fulton, who has been chief electrical engineer of the Sutherland project.

The trial of the case began on October 18, and when the parties rested on October 21, 1937, counsel were given time to furnish written briefs, and the matter was taken under advisement by the court until March 29, 1938, when the trial court entered its decree, finding generally in favor of the city, and finding there was no equity in the petition of plaintiff, nor in the cross-petitions of interveners, and therefore dismissed the same. Motions for new trial were filed by the two interveners, as well as by the plaintiff, which were each overruled, and from these adverse rulings appeals were taken to this court.

Our attention is first challenged to the use of the expression "and/or," which made it impossible for the voters, in reading the ballot, to determine whether they were voting to authorize the city of Columbus to construct, purchase, or otherwise acquire an electric light and power distribution

system, or, on the other hand, to construct, purchase, or otherwise acquire something entirely different, to wit, a transmission system to connect with some source of firm power. This term "and/or" left the choice for the officers to make after the dual proposition should be adopted by the voters at the election. The use of this expression seems to be increasing. "It has been said that the meaning may be clear, implying the intention either that effect shall be given to both the conjunctive 'and' and the disjunctive 'or,' or else that the one word or the other may be taken accordingly as the one or the other will best effect the purpose of the parties as gathered from the instrument taken as a whole." 3 C. J. S. 1069.

An early case (February 8, 1855) in which "and/or" appears was *Cuthbert v. Cumming,* 156 Eng. Rep. 668, involving an agreement by charterparty to load on board a vessel at Trinidad a full and complete cargo of sugar, molasses, "and/or" other lawful produce for Liverpool. The vessel was loaded with sugar in hogsheads and molasses in puncheons, but the vessel might have been able to hold additional cargo. Baron Alderson held that the "and/or" left it open in every way to fill the vessel with a complete cargo of sugar and molasses, or a complete cargo of other lawful produce.

In *Bell v. Wayne United Gas Co.,* 116 W. Va. 280, 298, 181 S. E. 609, it was said: "The involvements of the contract are accentuated by the frequent use of the baffling symbol 'and/or'—a disingenuous modernistic hybrid, inept and irritating." (Dissenting opinion of Maxwell, J.)

The American Bar Association Journal for July, 1932, published an editorial against the use of this expression, and received so many letters that in its September, 1932, issue a symposium was published, giving opinions from many lawyers, judges, decisions of courts, and references to law magazine articles, and the majority view was against its use. See, also, *Kornbrodt v. Equitable Trust Co.,* 137 Or. 386, 392, 2 Pac. (2d) 236, 3 Pac. (2d) 127.

In the "and/or" annotation in 118 A. L. R. 1367, we find

its use is condemned in statutes, ordinances, and legislative acts. Its use in pleadings and instructions to jury is also criticized. Amidst almost universal condemnation, a very few decisions and articles in two law magazines appear to uphold its use. The great majority of courts do all in their power to discourage its use, and it has been criticized by one court in this language: "It is manifest that we are confronted with the task of first construing 'and/or,' that befuddling, nameless thing, that Janus-faced verbal monstrosity, neither word nor phrase, the child of a brain of some one too lazy or too dull to express his precise meaning, or too dull to know what he did mean, now commonly used by lawyers in drafting legal documents." *Employers Mutual Liability Ins. Co. v. Tollefsen,* 219 Wis. 434, 263 N. W. 376.

The use of this symbol, "and/or," upon the ballot prepared in the case at bar led to the confusion of the voters, who were absolutely unable to determine definitely what they were voting for or against.

In the petition circulated by the Citizens' Committee, which was signed by the voters, one of the inducements offered to the voters reads as follows: "An ample supply of electrical energy will be available to said city at approximate cost upon the completion of the Hydro-electric Project of the Loup River Public Power District, of Columbus, Nebraska, about January 1, 1937." Considerable evidence was brought out as to when an ample supply of electricity would be available. It is argued in the brief that the one who drew the petition had never consulted an engineer, and that there was no ample supply of electricity available to the city, even a year later than the date mentioned in the preamble, upon which the voters relied in casting their votes, and at the time of trial it was still clear from the evidence that there would not be an ample supply of "firm" electrical energy available without stand-by steam plants.

In the ballot submitted to the voters, it provided that the cost would not exceed $250,000, and the evidence clearly

indicates that the present distribution system of the city of Columbus could not be purchased, or one like it built, for anything like $250,000, which amount was held out to the voters as the limit of the expense they were asked to authorize.

In the preamble to the petition which was circulated by the Citizens' Committee to get the signatures of the voters, it represented that electricity would be available to the city on January 1, 1937, and also that it would be furnished to the city at approximate cost. This implied to the voters that there would be a saving from the rates which they were paying under the present system, or at least that the rates would be as favorable as the then existing rates. There is, however, in the evidence no indication of what the cost of electricity will be to the users of electricity if the city purchases or constructs the utility, as authorized by the vote of the electors.

We will now take up a very few of the decisions bearing upon the points at issue in the case at bar. In *Board of Education v. Powers*, 142 Kan. 664, 51 Pac. (2d) 421, the proposition submitted to the school electors was, whether there should be issued bonds in the amount of $198,500 to erect a school building. An elector, who saw the election proclamation, read it, went to the polls and voted, had no means of knowing that it was proposed to erect a building which, when erected and equipped, would cost over $390,000, the balance of the sum to be obtained from the United States government. It was held that the proposition was obscurely stated, and the electors may have been misled. for had the electors known that a building of $390,000 was to be erected they would realize at once that there would be increased cost of maintenance, supervision, and upkeep, and that it would be a much more expensive establishment than some voters might have thought necessary or advisable, and might have voted against the issuance of the bonds for the amount that the school district was to furnish. The argument that the excess cost was to be paid through a federal agency, and would not increase the bur-

dens of the taxpayers, is not entirely true, but if it were true the taxpayer was entitled to know it when he was legally advised that there was to be an election. This decision reaffirms the old case of *City of Leavenworth v. Wilson,* 69 Kan. 74, 76 Pac. 400, 2 Ann. Cas. 367, which held that the ballot should clearly state the substance of the proposition submitted, and if the proposition on the ballot is stated in equivocal terms the purpose of the election is vitiated in advance.

"If there be two objects, and * * * they are submitted together, it is very clear that the voter cannot vote for one and against the other. He must vote against both, whereby he may defeat one, the success of which he desires, or he must vote for both, whereby he may cause the success of one which he desires to be defeated. If he fails to vote he may thus aid in causing the defeat of his favorite measure, and the adoption of the one he opposes. He has thus no liberty of choice." *City of Denver v. Hayes,* 28 Colo. 110, 63 Pac. 311.

In *Mann v. City of Artesia,* 42 N. M. 224, 76 Pac. (2d) 941, the notice of election provided that bonds for the construction of a municipal hospital would be payable not more than 30 years nor less than 20 years after the date of issue. In New Mexico, bonds cannot be lawfully issued by municipalities with a longer maturity than 20 years. It may have influenced some voters to support the issue because they thought the repayment of the bonds would be postponed until the next generation, and therefore the proposal as to maturities, as submitted on the ballot, was calculated to mislead the voters. The order of the trial court sustaining the demurrer was reversed.

In *Stern v. City of Fargo,* 18 N. Dak. 289, 122 N. W. 403, it is said that the object of the notice of an election is to give the voters and taxpayers such information as will enable them to consider, weigh, and discuss the merits of the proposition, and to combine several distinct and independent purposes in one proposition, without specifying the amount which is to be devoted to each, is a clear evasion of the law,

and, if permitted, would fritter away the safeguards thrown around such transactions.

In the case at bar, the ballot was designed to secure the assent of those voters who favored the purchase of the electric light and power distribution system already in use for many years, an electrical plant costing in better times around $800,000, which some of the voters may have believed could be secured for an amount not exceeding the $250,000 mentioned on the ballot, and, on the other hand, the ballot was designed to secure the favorable votes of all voters who might favor the construction of an entirely new municipal electric light and power system to compete with the one already established, and would also secure the "yes" votes of those voters who were not interested in either of these two things, but in an entirely separate proposition, the construction of a transmission line to some government hydro-project, which would furnish the city firm power at approximate cost, as stated to the voters.

These several propositions were submitted on the ballot without giving the voters a chance to vote for one as against the other. In a similar situation, it was asked by the Kansas court: "Did the electors vote to purchase or to construct transportation lines? Did some of them vote to purchase and did others vote to construct these lines? Frankly we do not know. * * * It cannot, of course, be seriously contended that the methods of acquiring distribution lines by 'purchase' and by 'building and construction,' are anything other than two separate and distinct methods of acquisition. The method of acquisition would be one or the other and not both." This Kansas action was instituted before any bonds were issued. There was no unnecessary delay. The petition stated a cause of action. The appeal was perfected immediately. The order of the trial court, sustaining the demurrer and dismissing the petition, was reversed. *Kansas Utilities Co. v. City of Paola,* 148 Kan. 267, 80 Pac. (2d) 1084. See, also, *Julson v. City of Sioux Falls,* 48 S. Dak. 452, 205 N. W. 43; *Eastern Shore Public Service Co. v. Town of Seaford,* 187 Atl. (Del. Ch.) 115.

The question of the accuracy and sufficiency of the statements made in the preamble of the petition which the voters were asked to sign, as well as the form and contents of the ballot submitted to the electors at the special election, have all been fairly raised and carefully considered. In our opinion, these instruments did not fully, clearly, and frankly disclose to the electors just what the city officials proposed to do, and action has been brought for relief in this case. In our opinion, the petition and the ballot presented statements of facts which were unfounded, and the voters relied upon these statements in casting their ballots. The propositions presented to the voters were multiple and obscure, and were not fairly and candidly stated, and voters would be confused upon the propositions submitted.

Many courts have held that a proposition may be submitted to purchase or erect a public utility, and that this may be considered as one proposition, but in the case at bar there was more than that simple question submitted to the voters, and in our opinion the special election was so defective in these particulars that it was null and void. Having reached this conclusion, it is not necessary in this action to pass upon the constitutionality of section 18-1601, Comp. St. Supp. 1937. The judgment of the trial court is

REVERSED.

The following opinion on motion for rehearing was filed June 27, 1939. *Rehearing denied.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ., and POLK, District Judge.

PAINE, J.

An opinion was adopted in this case which appears *ante*, p. 87, 285 N. W. 109. The case is again before us on a motion for a rehearing.

Appellees contend that this court overlooked the principle

of law involved in the case of *Hurd v. City of Fairbury*, 87 Neb. 745, 128 N. W. 638. In the *Hurd* case, the statute authorized the "purchase, erection or construction" of a public utility. The proposition was submitted to the electors in the words of the statute, and this court held that the proposition as submitted did not constitute a dual proposition, nor a proposition in the alternative, but that it amounted to a submission of a single, definite proposition. The case is clearly distinguishable from the one at bar. In the instant case, the proposition submitted was whether the city should "construct, purchase, or otherwise acquire an electric light and power distribution system, and/or transmission lines, and real and personal property needed or useful in connection therewith." In the *Hurd* case the question in effect was: Shall the city acquire an electric light plant by purchase, erection, or construction? The question submitted was single, the selection of the method being administrative only. But, in the case now before us, more than one question was submitted. The proposition in effect submitted these questions: Shall the city acquire an electric light and distribution system? Shall the city acquire transmission lines? The use of the symbol "and/or" certainly makes the proposition submitted indefinite and uncertain and leaves to the city authorities, not an administrative decision, but the absolute discretion as to whether either one or both of two separate and distinct properties shall be acquired. This deprives the electors of the right to determine for themselves the property to be acquired as contemplated by the statute and the scope of the activity in which the city was intending to engage. The proposition submitted was dual and indefinite, and, if sustained, would amount to an unwarranted extension of the rule announced in the *Hurd* case.

For the reasons stated in our former opinion, as amplified herein, we adhere to the conclusion heretofore reached and overrule appellees' motion for a rehearing.

REHEARING DENIED.