GERALD V. INSLEE ET AL., APPELLANTS, V. THE CITY OF
BRIDGEPORT, NEBRASKA, ET AL., APPELLEES.

45 N. W. 2d 590

Filed January 12, 1951. No. 32814.

*Davis, Stubbs & Healey,* for appellants.

*Van Pelt, Marti & O'Gara,* and *Robert J. Bulger,* for
appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action brought in the district court for Morrill County by certain taxpayers, electors, and users of electric energy in the city of Bridgeport, to enjoin the public officials of the city from the issuance and sale of revenue bonds authorized by a municipal election.

The city of Bridgeport is a city of the second class, with a population of between 1,700 and 1,750, and will hereinafter be referred to as the city. Where we have occasion to refer to the Consumers Public Power District we will do so as the Consumers District.

For several years, since 1935, a group of citizens of the city has been interested in municipal ownership of electrical facilities to serve the city. This was at a time when the franchise of the corporation serving the city with electric energy expired. The Consumers District has served the city with electric energy since January 2, 1942.

On October 2, 1947, the mayor and city council appointed a special attorney, Robert J. Bulger, to handle the board of health operations and the electric light and general transactions dealing therewith for the city. The special attorney performed legal services for the city in connection with an election held in April 1948, to authorize the issuance of $14,000 of municipal bonds to construct a street lighting system for the city. The bonds failed to carry at the election. His next legal work for the city was in the instant case to enjoin the taking of depositions. Thereafter he performed no legal work for the city on power matters.

On January 1, 1948, the mayor and council for the city employed the engineering firm of Fulton and Cramer of Lincoln, Nebraska, to prepare an engineering report on the construction of a municipal electric system, and surveys and estimates of costs on the main

street lighting system pursuant to their proposal by letter dated December 10, 1947, signed by the mayor. On or about May 12, 1948, the engineer's report was filed with the city clerk and will be discussed later in the opinion in connection with the questions presented on this appeal.

On July 1, 1948, the mayor and council of the city met in regular session in the city hall, and at that time passed a resolution calling for a special election for the 3d day of August 1948, at which time they proposed to submit to the electors of the city for their approval or disapproval the following: "Shall the City of Bridgeport, Nebraska, construct, purchase or otherwise acquire, an electric light and power plant, distribution system, and transmission lines, and real and personal property needed and useful in connection therewith to serve said City and its inhabitants and pay the cost thereof by pledging and hypothecating the revenue and earnings of said electric light and power. plant, distribution system and transmission lines, to be owned by said City, and

"Shall the City, in the exercise of said authority, issue and sell its Revenue Bonds of the principal amount of Two Hundred Twenty-five Thousand One Hundred Dollars ($225,100.00) and enter into such contracts in connection therewith as may be proper and necessary. Said Revenue Bonds shall be a lien only upon the revenues and earnings of the electric light and power plant, distribution system and transmission lines to be owned by said City and shall not be general obligations of the City and no taxes shall ever be levied upon property for their payment. Said bonds shall be issued at such time or times as the Mayor and Council may determine and be dated at the time of their issuance and shall become due and payable at such times as may be fixed by the Mayor and Council but in not exceeding twenty years from the date of their issuance and shall bear interest at a rate not exceeding four per cent (4%) per

annum, payable semi-annually; provided, however, any or all of said bonds shall be redeemable at the option of the City at any time on or after five years from the date of issuance thereof or at any earlier time fixed by the Mayor and Council. The proceeds received from the sale of said bonds shall be used and applied only to construct, purchase, or otherwise acquire, said electric light and power plant, distribution system, and transmission lines, and real and personal property needed and useful in connection therewith for the service of the City and its inhabitants?"

In the latter part of June 1948, L. B. Winter, a local merchant and city treasurer for about twenty years and interested in municipal ownership for a considerable length of time on his own initiative called two public meetings to be held in the city hall for the purpose of discussing municipal ownership of an electric system for the city. Upon his invitation the mayor was present at both meetings, and at the evening meeting several members of the city council, the city clerk, the city attorney, and the special city attorney were present. These were not council meetings, and no minutes were kept by the city clerk. Mr. Winter presided, and stated the purpose of the meeting was to determine what to do about putting the question of municipal ownership to the electorate. He told those present that "we wanted to carry a bond issue in an election, if possible, and we might need an organization to further that * * *." The matter was generally discussed. The mayor addressed the meeting and said that it was up to the people of the city to decide whether or not they wanted to own their own electric light system; that he was not going to do anything about it; that he and the council were not going to sponsor and promote an advertising campaign or have anything to do with the election; and that if the people of the city wanted it bad enough, the mayor and the council would put it on the ballot.

At the evening meeting three joint-chairmen were

selected, one of which was the city treasurer, to head an organization which was formed and known as the Bridgeport Taxpayers and Property Owners. In addition, four standing committees were selected, the absent voters committee, funds and finance, advertising and publicity, and automobile and transportation committees. None of the public officers of the city except the city treasurer were asked to, or served on any of these committees. The co-chairmen of the Bridgeport Taxpayers and Property Owners organization were to use their judgment as they thought best in promoting the acquiring of an electric system for the city.

Several committee meetings were held, most of which were in Mr. Winter's hardware store, to map strategy from time to time as to what might be done to further the cause, and as to what advertising might be put out in such respect. The evidence is not clear as to the presence of members of the city council at these meetings, or whether Mr. Bulger, referred to as special city attorney, attended any of the meetings. The mayor was present on one or two occasions, one when he was asked to come and bring the engineer's report.

Prior to the election, at the request of the Bridgeport Taxpayers and Property Owners organization, Bulger visited certain cities operating electric systems under municipal ownership to ascertain the manner of operation, the income, the expenses, the profits, and other matters pertaining to such ownership. The results of these visits and the data received therefrom were reported to the co-chairmen of the organization.

A public meeting was arranged for the evening of July 29, 1948, at the American Legion hall, called by the Bridgeport Taxpayers and Property Owners, and at which Bulger presided. Representatives from cities having municipal ownership of electric systems were present, introduced, and expressed their views on the subject. Representatives of the Consumers District were present, and an official of the district was introduced

and spoke upon the district's side of the issue. Robert Fulton, one of the consultant engineers employed by the city, was present, having been invited by Bulger to attend. He made a talk with reference to his experiences on the subject of municipal ownership and certain items contained in the engineering report.

Facts not heretofore set out but which may be pertinent to a determination of this appeal will be discussed as occasion requires in connection with the assignments of error.

At the conclusion of the plaintiffs' evidence the trial court sustained the defendants' motion to dismiss the cause. Upon the overruling of the plaintiffs' motion for new trial, plaintiffs perfected appeal to this court.

The plaintiffs' amended petition alleges that the election for the issuance and sale of the bonds is invalid, null, and void.

The question as presented on the ballot conforms to the resolution heretofore set out and to section 18-412, R. S. 1943, which authorizes any city or village to construct, purchase, or otherwise acquire an electric light and power plant and real and personal property needed or useful in connection therewith, and pay the costs thereof by the issue and sale of revenue bonds or debentures, or by pledging and hypothecating the revenue and earnings of any such plant owned or to be owned by such city or village, only if the proposition is first submitted to the electorate and approved by a majority voting thereon. The election resulted in favor of the city acquiring an electric system.

"In an equity suit, a motion to dismiss at the conclusion of the plaintiff's evidence affords a proper means of determining the sufficiency of the plaintiff's evidence to make a prima facie case." Paul v. McGahan, 152 Neb. 578, 42 N. W. 2d 172. We bear this rule in mind in analyzing the evidence.

The plaintiffs assign as error (1) the exclusion by the trial court of testimony and numerous exhibits, and

(2) the action of the trial court in sustaining a motion to dismiss at the conclusion of the plaintiffs' case and dismissing the cause.

Two primary questions are involved in this appeal and will be taken up in chronological order: (1) Is the election invalid in that the language appearing on the ballot is multifarious, ambiguous, and garbled so that the ballot does not clearly state the substance of the proposition submitted? (2) Were there such misrepresentations, misstatements of fact, and concealment of material facts exclusively in the possession of the public officers of the city, a special attorney, and consulting engineer employed by the city, sufficient to invalidate the election?

The plaintiffs rely on the case of Drummond v. City of Columbus, 136 Neb. 87, 285 N. W. 109, as conclusive of the case at bar as to the validity of the election.

We have previously set forth the proposition appearing on the ballot submitted to the voters of Bridgeport. The plaintiffs contend that the language appearing on this ballot presented to the voters several alternatives or courses of action, that is, that the council might (1) construct, (2) purchase, or (3) otherwise acquire (a) an electric light and power plant, (b) a distribution system, (c) transmission lines, and (d) real and personal property needed. In the cited case the proposition submitted, insofar as necessary to consider here, was: "Shall the city of Columbus, Nebraska, construct, purchase, or otherwise acquire an electric light and power distribution system, and/or transmission lines, and real and personal property needed or useful in connection therewith and pay the costs thereof by pledging and hypothecating the revenue and earnings of such distribution system and/or transmission lines to be owned by such city * * *." The plaintiffs contend that the proposition submitted to the voters in each instance was analogous, therefore the ballot in the instant case was designed to secure the assent of those voters who

favored the purchase of the electric light and power distribution system already in use, and, on the other hand, the ballot was designed to secure the favorable votes of the voters who might favor the construction of an entirely new electric light and power system to compete with the one already in existence in the city.

The cited case determined that the use of the symbol "and/or" as it appeared on the ballot prepared to be presented to the voters of Columbus led to confusion of the voters, who were absolutely unable to determine definitely what they were voting for or against. In the opinion denying the motion for rehearing, 136 Neb. 99, 286 N. W. 779, which distinguished the case of Hurd v. City of Fairbury, 87 Neb. 745, 128 N. W. 638, and the Drummond case, this court said: "But, in the case now before us, more than one question was submitted. The proposition in effect submitted these questions: Shall the city acquire an electric light and distribution system? Shall the city acquire transmission lines? The use of the 'and/or' certainly makes the proposition submitted indefinite and uncertain and leaves to the city authorities, not an administrative decision, but the absolute discretion as to whether either one or both of two separate and distinct properties shall be acquired. This deprives the electors of the right to determine for themselves the property to be acquired as contemplated by the statute and the scope of the activity in which the city was intending to engage."

We believe the language as it appears in the opinion denying the motion for rehearing is plain and explicit in that the symbol "and/or" led to uncertainty, ambiguity, and multiplicity which confused the voters who were unable to determine definitely the effect of their votes at this special election. The cited case is not conclusive of the case at bar as contended for by the plaintiffs.

In the case of Hurd v. City of Fairbury, *supra*, sections 8927 and 8994, Ann. St. 1909, were involved, which

are not like section 18-412, R. S. 1943, however, certain language contained in said sections is pertinent to like language contained in the latter section of the statutes cited. One of the propositions submitted in the case of Hurd v. City of Fairbury, *supra*, which at that time was a city of the second class the same as the city of Bridgeport in the instant case, was that of issuing the bonds of the city of Fairbury in the sum of $20,000 for the purpose of raising a sum sufficient to purchase or install and establish an electric light system within said city. The other was to issue bonds of the city in the sum of $115,000 for the purpose of purchasing or erecting, constructing, locating, and maintaining a system of waterworks within said city. It was held that under the statutes the bonds voted at the election constituted a valid obligation against the city, the proposition not being dual, nor in the alternative, to the extent of rendering the bonds void. With reference to section 8927, Ann. St. 1909, which authorized a city of the second class to purchase, erect, or construct a system of waterworks with necessary mains, etc., within the city, and to issue bonds for the purchase, erection, or construction and maintenance of such waterworks, etc., it was held that the submission was not a dual or alternative question, and was in compliance with the statute, and that the bonds were valid.

The language in the instant case as to the proposition submitted to the voters is comparable to that of Hurd v. City of Fairbury, *supra*, and the proposition submitted to the voters of Bridgeport is a single proposition, and not dual, selection of the method being administrative only. See, also, Drummond v. City of Columbus, *supra*.

The rule in the majority of jurisdictions is that a proposition submitted to the voters to erect or purchase a plant, public building, or other public utility is a single proposition, and that, on the adoption thereof, the option to erect or to purchase becomes a matter of discretion, vested in the proper representatives of the municipality.

See annotation in 5 A. L. R. 538 and cases cited therein.

With reference to the second question presented, the plaintiffs cite Drummond v. City of Columbus, *supra,* as follows: "The voters at an election on public utilities are entitled to definite information which will enable them to consider, weigh, discuss, and vote upon the actual merits of the proposition. If unfounded facts are set out which obscure the issues, or mislead the voters on material questions of fact, the election will be held to be null and void."

In the cited case the preamble to the petition circulated by the Citizens' Committee to get signatures of the voters contained statements that were unfounded upon which the voters relied. It is the plaintiffs' contention that the record in the instant case reflects unfounded facts which obstructed the issues and misled the voters on the material questions of fact, and that the case of May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448, is applicable on a factual situation somewhat analogous to the instant case as to the interest taken by public officials, by unofficial conduct on their part in a municipal election to acquire an electric system, and the doctrine of estoppel is applicable.

In this connection the plaintiffs direct attention to the history with reference to acquiring an electric system for the city, which may be briefly summarized as follows: Prior to January 2, 1942, the Western Public Service Company, a corporation, was the owner and operator of an electric producing and generating system with distribution lines and equipment in and extending outside the city of Bridgeport, and certain real estate and leases on real estate used in the business. All of these holdings were on January 2, 1942, conveyed and transferred to the Consumers District. On December 22, 1941, the city council enacted an ordinance whereby February 17, 1942, was fixed as the date whereupon the voters would be called upon to vote on the question of whether or not the city would take by condemnation

certain of the property and rights of the Western Public Service Company. The proposal to condemn was approved by a sufficient vote of the people. The result of the election was duly certified to the Supreme Court and pursuant to statute, a court of condemnation was appointed. The Consumers District brought an action in the district court against the members of the condemnation court, the mayor, the members of the city council, the city clerk, the city attorney and special city attorney, and the city treasurer, for the purpose of enjoining further proceedings in condemnation. The members of the condemnation court demurred to the petition of the Consumers District. These demurrers were sustained, and the cause dismissed. The Consumers District appealed. This court held that the city was barred from condemning under the proposal involved on account of inaccuracy and insufficiency of description in the proposal. The court said: "* * * it is imperative that the proposal shall name the persons in favor of whom an award may be assessed in order to render the condemnation valid as to them." The court also held that the city was limited in a proceeding against the Consumers District for the taking of an electric system for the reason the proceedings were violative of the power granted under section 70-650, R. R. S. 1943. The judgment of the district court was reversed with directions. See Consumers Public Power District v. Eldred, 146 Neb. 926, 22 N. W. 2d 188.

Plaintiffs argue that the city is now attempting to do as it did in Consumers Public Power District v. Eldred, *supra,* that is, to get authority by some means to permit the members of the city council to use their discretion in determining what to do and how to do it in order to enable the city to acquire an electric system.

The question of estoppel with reference to the character of the information given to the voters was raised in the last-cited case, but was deemed unnecessary to determine.

We find nothing in Consumers Public Power District v. Eldred, *supra,* that would be beneficial in determining this appeal, but cite the case and the determination of the principal issues involved to disclose the history of the proceedings with reference to the city endeavoring to acquire an electric system and the plaintiffs' contention of the methods employed by the city officials in attempting to accomplish such purpose.

The plaintiffs assert that immediately after the decision in the case of Consumers Public Power District v. Eldred, *supra,* the mayor and city council embarked upon another campaign to enforce the issue of municipal ownership of an electric system and an election authorizing the issuance and sale of revenue bonds in connection therewith. First, to accomplish these purposes, the mayor and council employed a special city attorney to conduct their campaign for them with reference to electric light matters. Next, the mayor and city council employed a special consulting engineer to give them some facts and figures upon which to stage a campaign. Thereafter the mayor and council approached the question on how the campaign should be conducted. Plaintiffs further assert that since the preceding election involving the condemnation proceedings, the case of May v. City of Kearney, *supra,* was decided, so in order to avoid participation in the campaign and the election to ensue, it would be necessary for the mayor and city council not to actively engage in the campaign and election for fear of the doctrine of estoppel as determined in May v. City of Kearney, *supra.* An organization was set up called the "Bridgeport Taxpayers and Property Owners," spearheaded by the city treasurer who had held that office for 20 years and was an advocate of municipal ownership, and who consulted the mayor and members of the council and other public officials with respect to the campaign and the election. Several meetings were held under the direction of this organization, and committees appointed by it to develop the strategy of the

campaign. We have heretofore made reference to the presence of the mayor and members of the council at some of the meetings and what action, if any, they took in the matter. To spread the propaganda for the election, the advocates of municipal ownership resorted through its organization to the one newspaper in the city, the editor being a member and chairman on publicity.

The plaintiffs further assert that the appointed special city attorney advised the organization, the mayor and council, and the committees of the organization during the campaign, and his employment was from time to time as the electric business developed; also, they were advised by the consulting engineer who had a personal interest in the matter, a contingent fee of $20,500, dependent upon the result of the election; and further, the mayor and council had contracted in advance of the election with a banking house to purchase the revenue bonds without competitive bidding.

The plaintiffs direct attention to the consulting engineer's report which recommended the construction of a complete generating station and distribution system, urged the construction of a standby station, and discussed the purchase of a portion of the power from the United States Bureau of Reclamation to supply the city. The report contained an estimate of the revenue that would be derived by the city, and an estimate of the net profits which would accrue in 10 years that would be available to retire the bonds. The report estimated the cost of purchasing power from the Bureau of Reclamation at $9,139 a year, while in fact an official letter from the Bureau of Reclamation fixes the minimum cost of such power at $12,000 a year. Plaintiffs further assert that the consulting engineer estimated in 1949 there would be 1,843,900 kilowatt hours sold and the revenue to be derived from such sale would amount to $53,470, while the actual revenue reflected by the books of the Consumers District showed $35,811 for the 12 months ending June 30, 1948, which plaintiffs argue

could be the only basis for actually figuring the revenue. It appears however that this figure did not include electricity sold to a sand and gravel company, residence properties located adjacent to the city limits, the fair grounds, or a locality a mile distant from the city, all of which were furnished power by the Consumers District.

Plaintiffs also assert that the estimate made by the consulting engineer was by comparison with other cities, instead of accepting the figures of the Consumers District as reflected by its books which were open to inspection as provided by section 70-622, R. R. S. 1943. Further, the report contained no engineering costs for operating a standby plant, which would cost between $3,000 and $4,000 annually; consequently, upon the actual factual situation, the engineer's report was in error to the extent of $25,000 a year, which constituted a gross overstatement and misstatement of the true facts.

Plaintiffs suggest the engineer's contingent fee of $20,500 might reflect a personal interest in formulating .the report, and a desire to have the election carry to obtain the benefits of the contingent fee. This reference to a contingent fee is based on a letter from one of the engineers directed to the mayor of the city under date of December 10, 1947. There is nothing conclusive with reference to the amount of the engineer's fee. That, by necessity, must depend upon the cost of the work to be done.

A review of the engineer's report discloses it is founded on estimates and comparisons. The engineer, in addressing the evening meeting of July 29, 1948, stated that in the event the revenues were not as shown by the estimates in the report, it would take longer to retire the bonds.

There is no evidence to show what contract, if any, the banking house mentioned by the plaintiffs had with the city. No representative of this banking institution was present at any meeting or participated in the cam-

paign or the election in any manner. While there is some intimation that the law firm representing this banking institution prepared the resolution and the ballot upon which the proposition appeared and upon which an election was held, it rather appears from the record that such counsel was obtained through the efforts of the city attorney.

Further, the plaintiffs make reference to several newspaper articles or advertising, and which were not admitted in evidence. It appears that the mayor and members of the city council who are directly responsible for the passage of resolutions or ordinances such as in this case were in no way involved in preparing the advertising media, nor was it authorized by them or signed by them, and is not binding upon the city. It is true that the advocates for municipal ownership and those opposed to it engaged in a strenuous campaign, and both sides of the issue were presented by advertising. It appears that this advertising in behalf of municipal ownership was formulated, prepared, and written by members of the publicity committee of the Bridgeport Taxpayers and Property Owners organization, with their acquiescence and consent, which organization and the committees thereof consisted of citizens and taxpayers, and was not formed by the mayor or members of the city council, nor did they participate in the formation thereof but specifically refrained from doing so. It is true that the city treasurer, an advocate of municipal ownership for a number of years, did so participate and become one of the joint chairmen of the organization. The duties of the city treasurer of cities of the second class, as defined by section 17-606, R. S. 1943, constitute nothing more nor less than a bookkeeping job, and he has no vote in the council, nor can he bind the mayor and council by any acts outside of those that constitute his legal duties as defined by law.

Reference is made to the interpretation of section 70-650.01, R. R. S. 1943, by the special city attorney, to

the effect that the city would not receive its electric distribution system debt free when the original bonds issued for its purchase by the Consumers District had been paid, due to the fact that other indebtedness of the Consumers District might be included, and such indebtedness would also have to be retired, which could be a continuing process. This interpretation of the cited statute was challenged by a representative of the Consumers District. However, the interpretation was not withdrawn. It occurred at the public meeting held July 29, 1948. This section of the statutes has not been litigated, and is not an issue in this case. It is referred to simply for the reason that the plaintiffs contend it is an erroneous interpretation of this section of the statutes and one that could prejudice the voters against the Consumers District in the election.

Some reference is made to concealment on the part of the mayor, city council, and city officials. This involves an estimate for street lighting. The Consumers District offered to install such system free of charge to the city. It appears, however, in return the Consumers District wanted a five-year contract to furnish the electric energy used by this system. Some contention is made that certain meetings were held unofficially by the mayor, city council, and other public officials, and no minutes were kept of these meetings, but they were held for the purpose of accomplishing the desires of the mayor, city council, and other public officials in obtaining an electric system for the city. We find no evidence to sustain this contention.

The plaintiffs conclude that, in the light of the whole record and the principle of law cited in Drummond v. City of Columbus, *supra*, the conduct of the mayor, city council, and city officials in participating in the election was such conduct as is condemned by May v. City of Kearney, *supra*, and for that reason the city officials should be enjoined from the issuance and sale of the revenue bonds in question. We find nothing in the

record that shows participation on the part of the mayor, the council, the city attorney, the engineer, or any other public officer in the campaign or the election analogous to the situation in May v. City of Kearney, *supra.* The special city attorney and the consulting engineer were not privileged and had no authority to speak for the mayor, the city council, or other public officers, and to bind them or the city in any manner. The report of the consulting engineer was based on experience in the field of municipal ownership, by comparisons with cities of the same size and under similar circumstances, and estimates were given—nothing conclusive and nothing definite. We can see no harm in having such estimates prior to the time of election as a matter of information to those who may be required to act in their official capacity as provided for in section 18-412, R. S. 1943.

There is no evidence of participation by the mayor and members of the city council in the campaign or the election. Specifically the record discloses that the mayor and city council made it emphatic that there would be no participation in the campaign or the election by the mayor or members of the council.

In the case of May v. City of Kearney, *supra,* the mayor and members of the city council took a great interest and active part in the campaign and the election. They formed an organization in which they participated in mapping the strategy of the election. They also participated in writing and checking written matter that appeared in newspaper advertisements for which they were responsible in an endeavor to carry the election. Further, the mayor actively engaged in radio broadcasts to present the issue as he conceived it and as members of the city council and other public officers conceived it, and urged that their viewpoint be accepted by the electorate.

We conclude that in such respect May v. City of Kearney, *supra,* is not applicable to the factual situation as it appears in this case.

The following authorities are applicable.

In the case of Detroit United Railway v. Detroit, 255 U. S. 171, 41 S. Ct. 285, 65 L. Ed. 570, an action to enjoin the acquiring of a system of street railways by means of bonds voted in a municipal election held for that purpose, the court said: "The bill abounds in allegations that voters were misled by the fraudulent conduct of the officials of the city in their efforts to procure the property of the complainant at less than its value by misrepresenting in a circular, and otherwise, the purpose and effect of the vote to be taken upon the question of acquiring a municipal system of transportation. * * * This feature of the bill is an attempt to inquire in a collateral way into the validity of an election which was held without steps being taken to enjoin, and which was vigorously contested to a final result."

"Bonds issued under the authority of a popular election cannot be set aside simply because all that may have been said by interested parties, in public speeches during the canvass which preceded the election, does not turn out to be in every respect true." County of Greene v. Daniel, 102 U. S. 187, 26 L. Ed. 99.

Courts must, as a rule, whenever possible uphold the validity of municipal bond elections. See, In re Validation of East Bay Municipal Utility District Water Bonds, 196 Cal. 725, 239 P. 38; Bullitt v. City of Louisville, 213 Ky. 756, 281 S. W. 1031; Anselmi v. Rock Springs, 53 Wyo. 223, 80 P. 2d 419, 116 A. L. R. 1250.

1 Dillon on Municipal Corporations (5th ed.), § 213, p. 430, states the general proposition that: "Inducements in the way of statements and representations made to influence a voter, although false and fraudulent, will not invalidate the election if it does not appear that by force and fraud the voter was compelled to vote in a way he did not desire to vote."

For the reasons given herein we conclude that the second question raised by the plaintiffs is without merit.

We affirm the judgment of the district court dis-

missing the plaintiffs' cause at the conclusion of their evidence.

AFFIRMED.