HERMAN F. NACKE ET AL., APPELLEES, V. THE CITY OF HEBRON, NEBRASKA, A MUNICIPAL CORPORATION, ET AL., APPELLANTS.

53 N. W. 2d 564

Filed May 16, 1952. No. 33170.

*Johnston, Thompson, Raymond & Mayer, Perry & Perry, Albert Pike II,* and *H. W. Hess,* for appellants.

*W. O. Baldwin,* for appellees.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an action to enjoin the defendants from entering into a contract for the construction of an electric power plant and from issuing revenue bonds of the city to secure funds to pay for said power plant. Issues were made and trial was had resulting in a decree enjoining the defendants as prayed. The defendants, hereinafter called the city, appeal. We affirm the judgment of the trial court.

We recite the facts appearing in the record, so far as necessary to a determination of the question presented here:

Prior to 1910, a private company generated and sold electricity to the city and its inhabitants. During that year an election was held which authorized the city to issue bonds for the purpose of "establishing and maintaining a system of Electric Lights." As a result of that election the city purchased and thereafter operated the plant theretofore in the city which consisted of a generating plant, transmission lines, and distribution system. That condition continued until 1921.

Beginning in 1921, as a result of a favorable election on the question of purchasing electric power, the city purchased its electric current from a third party or parties under a 10-year contract. That method of securing electric current continued uninterrupted to the time of the trial in this action. The contract for the purchase of power contained a provision whereby the city leased its generating plant to the supplier of current to be used as an auxiliary plant. Whether or not the city's plant was thereafter operated is not shown.

In 1928 or 1929, "boys" broke into the plant and removed brass and copper parts from the machinery. Thereafter it was not in an operating condition and, although it could have been repaired, that was not done.

In the early 1930's, the city sold the machinery and boilers, excepting the switchboard, and they were re-

moved from the building. Thereafter the city leased the building for various purposes.

In 1946, the city sold the building and ground on which it was located and delivered possession to the purchaser. The city, by brief here and without more, assures us that that sale was void. It does not appear that the sale has been otherwise challenged. The city here challenges the legality of its own act in order to aid in the defeat of this action. We need consider that contention no further than to point out that the city at the opening of the trial stipulated that it did not then own a generating plant, contending only that it had transmission lines and a distribution system.

It thus appears that from 1921 to the time of trial in 1951, the city has not generated electricity; from 1928 or 1929 to the time of trial it has had no operable generating plant; from sometime in 1930, it has had no machinery for the production of power; and from 1946 on, it has not owned the building formerly used for that purpose.

In 1950, the city council took steps looking to the construction and operation of a power plant. It employed an engineer, had plans and specifications prepared, published notice to bidders, and received bids. Preliminary steps were being taken to issue and sell revenue bonds to secure funds to pay for the same when this action was commenced. An authorizing election was not had.

It is the city's contention that as a result of the 1910 election it was given the power to acquire and operate an electric light and power plant, and that that is a continuing power.

The record here does not show the particular statutes under which the 1910 proceedings were authorized. The Legislature in 1889 passed an act to authorize a city of the second class "to establish and maintain, a system of electric lights." Laws 1889, c. 19, p. 350. That act with amendments is found in Annotated Statutes 1909, sections 8994 to 8997. Because of the particular

language of the statute and the use of that same language in the proceedings in 1910, we assume that the proceedings were under that act. Possibly for the reasons suggested by State v. Searle, 76 Neb. 272, 107 N. W. 588, these sections were omitted from the 1913 revision. See Rev. St. 1913, p. 2515.

In Carr v. Fenstermacher, 119 Neb. 172, 228 N. W. 114, the city was proceeding to buy a Diesel engine and other equipment for the improvement of an electric light and power plant that it was then operating, the new equipment being needed to make the plant efficient. The statute there construed and applied was section 4396, Comp. St. 1922. It authorized the city "to purchase, construct, maintain and improve heating lighting systems." This act stems back to chapter 22, Laws 1901, page 326, which authorized cities of the first and second class "to establish and maintain a heating or lighting system." As it now is, with amendments, see sections 19-1401 to 19-1405, R. S. 1943. Sections 18-101 to 18-105, Comp. St. 1929, are discussed in Interstate Power Co. v. City of Ainsworth, 125 Neb. 419, 250 N. W. 649.

Granting the original power, as a result of the 1910 election, nevertheless the city does not attempt to bring its acts here within either the statutes involved in the 1910 election or in the Carr case. It now claims the authority for its acts under the provisions of sections 70-503, R. R. S. 1943, and 18-412, R. S. 1943, as construed by our decisions.

It is a matter of common knowledge that the electric industry was in its infancy in this state at the time the act on which the city based its 1910 election was passed, and likewise when the original act construed and applied in the Carr case was passed. Generally at that time electric plants, by whatever name they were described, consisted of one unit under one ownership and were operated independently of other plants. The one unit had as its three component parts a generating

system, some transmission lines, and a distribution system. There was no particular occasion to distinguish between the three component parts in legislation at that time. The Carr case must be read in the light of those facts and the statute there construed.

However, by 1930, that situation had changed. The industry had developed, as had the uses of electricity. Electrical energy was being produced in large central plants and distributed by far-flung networks of transmission lines, so that one plant served many communities through local distribution systems. In some instances all three component parts were owned and operated by one party; in other instances power was sold at the plant and delivered to transmission lines; and in still other instances, power was produced, transmitted, and sold to independent distributing parties. In short, what had been one industry became in some instances two, and in others three, industries—each often independent in ownership and operation of the other.

At the November election in 1930, the people of this state enacted Initiated Law No. 324 (now, as amended, sections 70-501 to 70-515, R. R. S. 1943). There they legislated not as to electric light and power systems but throughout the act referred to electric light and power plants—distribution systems—transmission lines. Throughout the act it is recognized that while the component parts might be integrated, yet they were separable and could be and were treated as independent units. Section 3 of the Initiated Law, as amended, now appears as section 70-503, R. R. S. 1943. This section is as follows: "In lieu of the issuance of bonds or the levy of taxes as otherwise by law provided, and in lieu of any other lawful methods or means of providing for the payment of indebtedness, any city, village, or public electric light and power district within this state shall have the power and authority, by and through its governing body or board of directors, to provide for or to secure the payment of the cost or expenses of purchasing, con-

structing, or otherwise acquiring, extending and improving any real or personal property necessary or useful in its operation of any electric light and power plant, distribution system or (and/or) transmission lines, by pledging, assigning, or otherwise hypothecating, the net earnings or profits of such electric light and power district, city or village, derived, or to be derived, from the operation of such electric light and power plant, distribution system or (and/or) transmission lines, and to that end, to enter into such contracts and to issue such warrants or debentures as may be proper to carry out the provisions of this section." The act originally provided "and/or" where shown in parentheses. The 1943 revision changed the act to the language above quoted.

In Interstate Power Co. v. City of Ainsworth, *supra,* the city had neither power plant, transmission lines, nor distribution system. We there held that neither express nor implied power was conferred by Initiated Law No. 324 "to acquire an electric light and power plant and pay for it by pledge of future earnings." Language used in that opinion must be read in the light of facts which obviously did not call for a clear distinction to be drawn between the three units.

In Southern Nebraska Power Co. v. Village of Deshler, 130 Neb. 598, 265 N. W. 880, the village had a "complete plant and distribution system" in operation. There the proposal was for the purpose of enlarging the light plant and distribution system already constructed. There Initiated Law No. 324 was relied upon. It was held that the village had the power under the act. But there again, because of the factual situation, we were not called upon to distinguish between the several units.

The decision in Interstate Power Co. v. City of Ainsworth, *supra,* was filed October 20, 1933. The 1935 Legislature enacted chapter 38, section 1, Laws 1935, page 153. As amended, it now appears as section 18-412, R. S. 1943, and, so far as material here, is as follows: "Supplemental to any existing law on the subject, and

in lieu of the issuance of general obligation bonds, or the levy of taxes upon property, as by law provided, any city or village within the state of Nebraska may construct, purchase, or otherwise acquire, an electric light and power plant, distribution system, and (and/or) transmission lines, and real and personal property needed or useful in connection therewith, and pay the cost thereof by pledging and hypothecating the revenue and earnings of any electric light and power plant, distribution system, and (and/or) transmission lines, owned or to be owned by such city or village. In the exercise of the authority granted in this section, any such city or village may issue and sell revenue bonds or debentures and enter into such contracts in connection therewith as may be proper and necessary. Such revenue bonds or debentures shall be a lien only upon the revenues and earnings of the electric light and power plant, distribution system, and (and/or) transmission lines owned or to be owned by such city or village. No city or village shall pledge or hypothecate the revenue and earnings of any electric light and power plant, distribution system, or (and/or) transmission lines, nor issue revenue bonds or debentures, as authorized by this section, until the proposition relating thereto has been submitted in the usual manner to the qualified electors of such city or village at a general or special election and approved by a majority of the electors voting on the proposition submitted; * * *. The requirement herein of a vote of the electors, however, shall not apply when a city or village seeks to pledge or hypothecate such revenue and earnings, or issue revenue bonds or debentures, *solely* for the maintenance, extension or enlargement of any electric light and power plant, distribution system, or (and/or) transmission lines *owned by such city* or village." (Emphasis supplied.) The original act provided "and/or" where shown in parentheses. The 1943 revision changed the act to the language above quoted, and

made other minor changes in language not material and not set out here.

In Slepicka v. City of Wilber, 150 Neb. 376, 34 N. W. 2d 646, we construed and applied the same statutes that are here involved. There we were careful to point out that the city of Wilber retained at all times one of its generating units which "was kept for stand-by service only," and although it was old and inefficient, it was operable. It was "inadequate for the city's needs." We carefully pointed out that the city "temporarily" bought a part of and subsequently all its electrical energy. In the light of the fact situation there was no occasion to particularly distinguish between the specific units. There they were enlarging an existing power plant which the city then owned.

We did have occasion to point out in Drummond v. City of Columbus, 136 Neb. 87, 285 N. W. 109, on rehearing, 136 Neb. 99, 286 N. W. 779, that the powers granted and limited by the 1935 act related to not one system but to separate units, to wit, power plant, transmission lines, and distribution system. See, also, Munch v. Tusa, 140 Neb. 457, 300 N. W. 385; Inslee v. City of Bridgeport, 153 Neb. 559, 45 N. W. 2d 590.

These decisions do not directly determine the specific question here involved, which is, may a city issue revenue bonds without an authorizing election to pay for the construction of a complete electric power plant when it does not own, and has not owned or operated for many years, such a plant, but does own transmission lines and a distribution system.

As we said in City of Curtis v. Maywood Light Co., 137 Neb. 119, 288 N. W. 503, the intention of the Legislature is here to be obtained primarily from the language used in the enactment, which must be given effect according to its plain, obvious meaning.

" 'In the construction of a statute, effect must be given, if possible, to all its several parts. No sentence, clause or word should be rejected as meaningless or super-

fluous, if it can be avoided; but the subject of the enactment and the language employed, in its plain, ordinary and popular sense, should be taken into account, in order to determine the legislative will.'" In re Estate of Edwards, 138 Neb. 671, 294 N. W. 422.

We have recently restated the rule that "In construing a statute, effect must be given, if possible, to every word,. clause, and sentence, so that no part of its provisions will be inoperative, superfluous, void, or insignificant." Safeway Cabs, Inc. v. Honer, ante, p. 418, 52 N. W. 2d 266.

The first sentence of section 70-501, R. R. S. 1943, relates to ownership or operation not of a light and power plant or system but to the three specific units repeatedly referred to in the act.

The first sentence of section 18-412, R. S. 1943, quoted above, provides that a city "may construct, purchase, or otherwise acquire * * *." Obviously such a proposition requires an authorizing election. The last sentence of section 18-412, R. S. 1943, quoted above, provides that the requirement of a vote shall not apply where the city proposes to pledge or hypothecate the revenues or earnings or issue revenue bonds "solely for the maintenance, extension or enlargement of any electric light and power plant * * * owned by such city* * *." Obviously what the city proposes to do here is to "construct" a power plant. It is not undertaking "solely" to maintain, extend, or enlarge that plant, nor does it "own" it. It does not exist.

The effect of these acts is to say, these things you may do to that which you own without a vote of the people, whether it be a light and power plant, or distribution system, or transmission lines, but as to what you do not own, you must have an authorizing vote.

To sustain the city's position would be to read out of the statutes the oft-repeated specific references to the three component units of an electric system. It would have us read the act as though the people in the initia-

tive act, and the Legislature in the 1935 act, used "electric light and power plant" as inclusive of distribution systems and transmission lines. It would have us render the repeated reference to distribution systems and transmission lines as surplusage. Obviously they were used for a purpose and must be given effect.

The city at one time owned a power plant, a transmission line, and a distribution system. Suppose it then dismantled and sold not only the power plant, as it did here, but also sold its distribution system—retaining ownership only of a transmission line. If the city's contention here is correct, then it could, on the foundation of having a transmission line, construct both a power plant and a distribution system, and issue revenue bonds to secure money to pay therefor without an authorizing vote of the people. We find nothing in this act, or in our legislative history, of any purpose to waive the requirement that the people shall first approve or disapprove such a course of action. The city's acts are not within the exceptions of the last sentence of section 18-412, R. S. 1943. The statute requires an election and approval of the proposal by the electors.

We conclude that the city does not have the power to do that which it here undertook to do. The rule is: "* * * 'When bonds or other evidences of indebtedness are about to be issued by public officers illegally or without complying with the statute authorizing their issue, equity has jurisdiction to grant an injunction, * * *. Where the law requires that the question shall be submitted to popular vote, an issue of bonds without such a vote will be enjoined.'" May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448.

The judgment of the district court is affirmed.

AFFIRMED.