SAFEWAY CABS, INC., A CORPORATION, APPELLANT, CHECKER CAB CO., INC., A CORPORATION, ET AL., INTERVENERS AND APPELLANTS, V. MICHAEL O. HONER, APPELLEE.
52 N. W. 2d 418

Filed March 7, 1952. No. 33000.

*Kennedy, Holland, DeLacy & Svoboda, Swenson, Viren & Turner*, and *Frost, Peasinger & Meyers*, for appellants.

*Pilcher & Haney* and *Loyal G. Kaplan*, for appellee.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

We are here presented with appeals from orders of the Nebraska State Railway Commission denying a complaint to terminate a certificate of convenience and necessity and granting in part an application to transfer the certificate. We reverse the orders in both matters.

The Nebraska State Railway Commission will be hereinafter referred to as the commission.

Safeway Cabs, Inc., hereinafter referred to as Safeway, was the complainant in the first matter designated as F. C. 875. In the second matter Safeway protested the granting of the application. This is designated as

B-595. The two matters proceeded concurrently, were heard separately in fact but upon a consolidated record, and were determined by the commission in a joint order.

In F. C. 875, other cab companies joined as interveners, without, however, changing the issues to be determined here. Likewise there were several protestants in B-595. As to the issues presented here, no reference need be made to other parties. Also in F. C. 875, there was an amended complaint seeking to reform the certificate so as to place a further limitation in it. The complaint as to that matter was denied. As we view the issues here, no further reference need be made to that question.

The application for transfer in B-595 was filed January 18, 1949. The formal complaint in F. C. 875 was filed February 1, 1949. Both matters have to do with a certificate of public convenience and necessity issued February 15, 1938, to Michael O. Honer, hereinafter called Honer. Different questions are presented by the two proceedings. They will be determined separately. Both matters are considered subject to the rule that "On an appeal to the Supreme Court from an order of the Nebraska State Railway Commission administrative or legislative in nature, the only questions to be determined are whether the Nebraska State Railway Commission acted within the scope of its authority and if the order complained of is reasonable and not arbitrarily made." In re Application of Neylon, 151 Neb. 587, 38 N. W. 2d 552. See, also, In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 352, 41 N. W. 2d 157.

On February 15, 1938, the commission issued a certificate of public convenience and necessity to Honer granting "* * * authority to operate motor vehicles for passenger hire in the City of Omaha, Nebraska under the name of Checker Cab Company, subject to and in conformity with Resolution No. 137, Supplemental Order No. 1." Resolution No. 137, supplemental order No. 1, was in part: "It is further ordered that

on and after June 1, 1937, all certificates of public convenience and necessity heretofore granted to and in the name of a service company to operate motor cabs or taxicabs not owned by such service company, shall be null and void and the owners of such motor cabs or taxicabs shall cease to operate unless such owners hold a certificate of public convenience and necessity from this Commission, and in that event such owners shall not operate except through such service company, unless authorized to do so by the Commission." The certificate was for an "owner-driver" operation.

In January 1949, Honer entered into an agreement to sell the certificate and his cab to one Robert S. Gillard, hereinafter referred to as Gillard. The agreed consideration for the certificate was $100, and for the cab $1,000. The application in B-595 was for the purpose of consummating that transaction.

The question presented by F. C. 875 arose in point of time prior to the issues presented by B-595. We first consider F. C. 875.

The complaint charged that Honer, without the authority of the commission, had failed to operate from and after May 4, 1948; that from and after May 8, 1948, he had failed to have proper insurance on file with the commission and had willfully failed to comply with the said certificate and the orders, rules, and regulations of the commission; and that accordingly he had abandoned all operating rights under the certificate. The prayer was that the certificate be terminated, revoked, and canceled.

Honer answered the complaint denying that he had abandoned or intended to abandon the certificate, and denying that he willfully failed to comply with his certificate and the orders, rules, and regulations of the commission. The hearings of the examiner on this matter were held and concluded in April 1949.

The complaint is based on the provisions of section 75-238, R. R. S. 1943, which provides: "Permits and

certificates shall be effective from the dates specified therein, and shall remain in effect until terminated as herein provided. Any such permit or certificate may, upon application of the holder thereof, in the discretion of the State Railway Commission, be revoked or may, upon complaint or on the commission's own initiative, after notice and hearing, be suspended, changed or revoked in whole or in part, for willful failure to comply with any of the provisions of sections 75-222 to 75-250, or with any lawful order, rule or regulation of the commission promulgated thereunder, or with any term, condition or limitation of such permit or certificate."

The complaint is also based on the provisions of section 75-239, R. R. S. 1943, which provides in part: "No certificate or permit shall be issued to a motor carrier or remain in force unless such carrier complies with such reasonable rules and regulations as the State Railway Commission shall prescribe, governing the filing and approval of surety bonds, policies of insurance, qualifications as a self-insurer, or other securities or agreements, in such reasonable amount as the commission may require, conditioned to pay, within the amount of such surety bonds, policies of insurance, qualifications as a self-insurer, or other securities or agreements, any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles under such certificate or permit, or for loss or damage to property of others."

Honer's cab was operated as a unit of the Checker Cab Company fleet, hereinafter referred to as Checker, under an arrangement whereby he paid a fee to Checker for operating in its fleet and permitted the use of his cab by it "on the opposite shift." His cab carried the color scheme of Checker and a Checker number. Honer operated only the one cab.

There is no issue in this record as to Honer's operations prior to May 4, 1948. On that day he was involved

in an accident wherein his cab was damaged and he received personal injuries. Following the accident the cab was towed to the Checker lot and there remained except for a short time in December when it was repaired. Honer testified that he had the cab repaired so that he could sell it. He gave the keys to an official of Checker for that purpose. It was agreed its value was $1,000 or more. He agreed to sell the cab to Gillard in January 1949, for $1,000, and signed the papers at that time but did not receive the payment.

Honer was hospitalized for a period of time and up to the time of the hearing testified that he was not able to drive a cab and did not know when he would be able to do so.

The evidence is that Honer carried and paid for the collision, fire, theft, and tornado insurance on the cab. That insurance policy expired December 14, 1948. He did not renew it, testifying that he did not pay the renewal insurance because he was not operating and did not intend to operate the cab "as a cab."

The liability insurance on Honer's cab was carried by Checker and the premiums paid by it. On May 8, 1948, the insurance carrier filed with the commission notice that the Honer cab had been eliminated from coverage. It was not thereafter covered by liability insurance.

Honer testified that during the summer and fall he intended to go back to work but that thereafter he knew he would never be able to go back to work. He fixes the date of this at one place as in September, again on October 8, and again between October 1948, and January 1949. He further testified that he then intended that if he ever was able to drive a cab again, it would be as a driver on a commission basis, and that he knew or "felt" he would never be able to drive again and for that reason he undertook to transfer his certificate to Gillard.

R. C. plates for 1949 were not required at the time

of the agreement with Gillard. Honer testified that he did not apply for 1949 plates "because it was already assigned over before the time to get one."

Honer further testified that he had no intention of giving up or abandoning his right to operate up to the time he "transferred" to Gillard and that he had not abandoned up to that time.

The commission found that Honer "will be unable to resume taxicab operations."

There is evidence also that sometime during the winter of 1948-1949, Checker placed a cab in operation bearing the Honer number 19 and operated it under the Honer R. C. 1948 plates. These facts were discovered by a routine investigation by an employee of the commission. The inference of the evidence is that it was surreptitiously done by Checker. There is no showing that it was done with the knowledge, consent, or approval of Honer, nor is there any showing that it was done for his benefit or as an operation under his certificate, but rather was done as an operation of Checker under its certificate. The examiner stated in his report that under General Order 84 of the commission, Checker was required to furnish insurance coverage whether its " 'motor vehicles are specifically described in the policy or not,' " and that notice to the commission that certain cabs had been removed from coverage was unnecessary for the reason that Checker "has coverage for any and all vehicles operated." He also recited a provision that Checker's policy covered individual owners as additional assureds.

The examiner and the commission disposed of the insurance feature of this complaint by reasoning that Checker used Honer's R. C. plates and that passengers transported by the new cab using those plates had complete insurance coverage. In short, it was held that Checker's operation of its own cab under its insurance coverage, because of the use of Honer's R. C. plates, properly or otherwise, operated to furnish insurance

to Honer on his cab that was not in operation and had been withdrawn from insurance coverage. Obviously such a conclusion does not follow.

We have held that " 'Willful failure,' as used in section 75-238, R. S. 1943, is such behavior through acts of commission or omission which justifies a belief that there was an intent entering into and characterizing the failure complained of. A failure to perform an act for a long period of time, which is required by law to be performed, generally constitutes a willful failure to perform." Union Transfer Co. v. Bee Line Motor Freight, 150 Neb. 280, 34 N. W. 2d 363. See, also, In re Application of Resler, 154 Neb. 624, 48 N. W. 2d 718.

We have then a situation where an "owner-driver" cab was not operated at any time after May 4, 1948. So far as Honer was concerned, the service required of him by his certificate was not performed or tendered to the public. Honer was incapacitated and unable to drive, and made no effort to secure a driver of his cab, assuming that a driver other than Honer was proper. His cab was not in serviceable condition. It was not operated as a cab after May 4, 1948. Honer made no effort to repair it for several months and then repaired it to sell and not to operate. That liability insurance on his cab was required is not disputed. It was not furnished after May 8, 1948. The evidence leads to but one rational conclusion and that is to the fact that Honer had abandoned in fact and intent all operating rights under his certificate and that it was willful under the above definition. True, he testified at one place to a general intent otherwise, but that statement is not consistent with the circumstances and facts shown by the record and the finding of the commission. Rightly construed, it expressed his belief that he still had some right under his certificate that he thought he could transfer for a consideration. He intended only to sell.

The commission by its order dismissing F. C. 875

accordingly permitted Honer to hold a certificate of convenience and necessity for a service which he had not operated for some time, was not then operating, and which he did not thereafter intend to operate and which he was unable to operate. Under the circumstances shown here its order in that respect was unreasonable and arbitrary. See, Publix Cars, Inc., v. Yellow Cab & Baggage Co., 130 Neb. 401, 265 N. W. 234; Publix Cars, Inc., v. Yellow Cab & Baggage Co., 130 Neb. 413, 265 N. W. 240.

We go then to the issues presented by the appeal in B-595.

This is a joint application of Gillard and Honer for the transfer to Gillard of the certificate of Honer. Gillard makes the application as an individual proposing to operate under the trade name of Greyline Taxi. In his application he recites that he then operated motor vehicles under a commission certificate "as stockholder and President of Airline Ground Service."

The various objecting parties presented many issues as to the reasons why the application should not be granted. These we do not deem it necessary to determine here.

Hearings were held by an examiner on the application and concluded in April 1949. It is apparent that the examiner and the applicant proceeded on the theory that the commission had the power to transfer the certificate and that a showing of public convenience and necessity was not required.

On July 7, 1949, our opinion in the case of In re Application of Neylon, *supra,* was filed. On August 9, 1949, Gillard filed his application to reopen the proceedings to take further testimony on the issues of public convenience and necessity. The application to reopen was granted and an extended hearing held.

Gillard testified that it was his intention to operate one cab at the beginning but that if success crowned his venture, he would expand to a maximum of 10 or 15 cabs.

As to public convenience and necessity, the examiner found that "little, if any, proof was shown for additional city-wide service." The commission apparently accepted that finding for it turned for authority to grant the application to section 75-240, R. R. S. 1943. It should be noted that the amendment to that section, now 75-240, R. S. Supp., 1951, was not then effective and is not involved here.

Section 75-240, R. R. S. 1943, is in part: "It shall be lawful, under conditions specified below, but under no other conditions, for two or more motor carriers to consolidate or merge their properties, or any part thereof, into one ownership, management or operation of the properties theretofore in separate ownership, or for any such motor carrier, or two or more such motor carriers jointly, to purchase, lease or contract to operate the properties, or any part thereof, of another such carrier; or for any such motor carrier, or two or more such carriers jointly, to acquire control of another such carrier through purchase of its stock; or for a person to acquire control of two or more motor carriers through ownership of their stock; or for any such person who has control of one or more motor carriers to acquire control of another such carrier through ownership of its stock."

Airline Ground Service, Inc., hereinafter called Airline, is a motor carrier holding a certificate of public convenience and necessity authorizing it to transfer passengers between the Municipal Airport and downtown Omaha. Gillard testified that he was president and general manager, and owned 51 shares of stock in this corporation. We do not find any testimony as to the number of shares of stock outstanding. However, in a "balance sheet" dealing with Airline, there is a recital that there were 91 shares of common stock. The commission found that Gillard owned 51 percent of the outstanding stock of the corporation. For the purposes of this opinion we assume that the record shows Gillard

owned a majority of the outstanding stock. On the basis of that stock ownership, the commission found that Gillard was a motor carrier as contemplated by the act. That finding is the basis for a principal contention of the appellants here. The commission thereupon entered an order approving the Gillard application in part, authorized him to conduct operations under the certificate issued to Honer, and assigned the operating rights and authority to Gillard to be conducted "under the name of Checker Cab Company." Among other things, Checker assigns that as error. We do not reach that question.

The initial and, as we view it, the controlling question here is whether or not Gillard is a "motor carrier" within the meaning of that provision in section 75-240, R. R. S. 1943.

In summary we have this situation. Airline is a motor common carrier holding a certificate of public convenience and necessity. Gillard is an individual holding a majority of the common stock of Airline. Although it does not appear to have entered into the consideration of the commission, Gillard is also shown to be president and general manager of Airline. As we view it, that fact makes no material difference.

We start with a rule that is elementary. "A corporation is a complete entity, separate and distinguishable from its stockholders and officers * * *." Solheim v. Hastings Housing Co., 151 Neb. 264, 37 N. W. 2d 212.

Subdivision (8), section 75-223, R. R. S. 1943, defines a motor carrier, as used in the act, to mean "any person owning, controlling, managing, operating, or causing to be operated, any motor-propelled vehicle used in transporting passengers or property for hire over any public highway in this state." It was on the basis of this definition that the commission held Gillard to be a motor carrier.

Subdivision (1), section 75-223, R. R. S. 1943, states

that "person," as used in the act, "means any individual, * * * corporation * * *."

The term "motor carrier," as defined in the act, obviously was intended to be a term inclusive of both a common carrier and a contract carrier, also defined in the act. It is also patent that the term is intended to include those motor carriers which under the act have or are required to have either a certificate of public convenience and necessity as a common carrier or a permit as a contract carrier.

The definition does not refer to any person owning, controlling, managing, operating, or causing to be operated "a corporation" holding a certificate or permit, but, on the contrary, relates those terms to "any motor-propelled vehicle used." We think it obvious that whatever is done by Gillard with the vehicles of Airline under its certificate is done as an act of the corporation and not as an act of the individual as an officer or stockholder.

The last three clauses of section 75-240, R. R. S. 1943, quoted above, recognize a difference between the control of a motor carrier through stock ownership and the carrier itself. Subject to the powers given the commission, the first of the three clauses authorizes a motor carrier to acquire control of another such carrier through purchase of its stock. The last of the clauses authorizes a person who has control of one or more motor carriers to acquire control of another carrier through ownership of its stock. It appears that if the commission's construction of the definition clause is correct, then the last of the clauses in section 75-240, R. R. S. 1943, becomes largely redundant.

The rule is that in construing a statute, effect must be given, if possible, to every word, clause, and sentence, so that no part of its provisions will be inoperative, superfluous, void, or insignificant. Thomas v. Rasmussen, 106 Neb. 442, 184 N. W. 104.

The statutory definition of motor carrier by the very terms of the first clause of section 75-223, R. R. S. 1943, applies to all provisions of the act. It follows that if the commission's construction of the definition of motor carrier is correct, then, among others, the following statutory provisions would be applicable to every majority stockholder of a corporate motor carrier: The declaration of legislative policy contained in subdivision (3), section 75-222, R. R. S. 1943; the annual fee provision of section 75-226, R. R. S. 1943; the license plate provisions of section 75-227, R. R. S. 1943; and the insurance and classification provisions of section 75-239, R. R. S. 1943. A reading of the sections demonstrates that there was no such legislative intent. To construe those provisions as applying to such a stockholder would be absurd.

Assuming, but not holding, that there is ambiguity in the act or that it is susceptible to two constructions, the rule is: "When a statute is ambiguous or susceptible of two constructions, one of which creates absurdities, unreasonableness or unequal operation and the other of which avoids such a result, the latter should be adopted." Pierson v. Faulkner, 134 Neb. 865, 279 N. W. 813.

It necessarily follows that a majority stockholder of a corporate motor carrier is not a motor carrier within the definition of motor carrier in subdivision (8), section 75-223, R. R. S. 1943; and that section 75-240, R. R. S. 1943, does not authorize the commission to approve the application, and by the provision "but under no other conditions" denied the commission the power that it undertook to exercise. The commission was without authority to approve the application and erred in doing so. This decision makes it unnecessary to state or determine the other matters presented.

The order of the commission in F. C. 875 is reversed and the matter is remanded with directions to sustain the complaint. The order of the commission in B-595 is

reversed and the matter is remanded with directions to dismiss the application.

ORDERS APPEALED FROM REVERSED
AND REMANDED WITH DIRECTIONS.